# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**EMILY BASINGER TANNER,**

      **Plaintiff,**

v.                                             Civil Action 2:20-cv-4306
                                                      Judge Sarah D. Morrison
                                                      Magistrate Judge Jolson

**COMMISIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Emily Basinger Tanner, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

It appears that Plaintiff previously filed applications for SSI and Disability Insurance Benefits ("DIB") in 2014 alleging that she became disabled on March 30, 2010. (Tr. 81). Those applications were denied at the initial and reconsideration levels; a hearing was held on May 10, 2016; and Administrative Law Judge Timothy Gates ("ALJ Gates") issued a determination denying the applications on June 2, 2016. (Tr. 78–101). In that determination, ALJ Gates concluded that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary work. (Tr. 88). The Appeals Council did not disturb that determination, and it does not appear that Plaintiff sought judicial review. (Tr. 102–07).

Plaintiff protectively filed her current application for SSI in October 2017, alleging that she became disabled on October 4, 2017. (Tr. 219–26). After her application was denied initially and on reconsideration, Administrative Law Judge Deborah E. Ellis ("ALJ Ellis") held a hearing on August 22, 2019. (Tr. 36–75). On September 23, 2019, ALJ Ellis issued a second unfavorable determination. (Tr. 12–35). The Appeals Council denied Plaintiff's request for review, making the ALJ Ellis' decision final for purposes of judicial review. (Tr. 1–6).

Plaintiff filed the instant case seeking judicial review of the Commissioner's decision on August 23, 2020 (Doc. 1), and the Commissioner filed the administrative record on February 18, 2021 (Doc. 10). Plaintiff filed her Statement of Errors, (Doc. 11), on April 5, 2021, Defendant filed an Opposition, (Doc. 12), on May 20, 2021. Because Plaintiff did not file a reply, this matter is now ripe for consideration.

### A. Relevant Statement to the Agency and Hearing Testimony

ALJ Ellis summarized Plaintiff's statements to the agency and the relevant hearing testimony:

> In her application for benefits, the [Plaintiff] alleged disability on the basis of COPD, emphysema, asthma, bipolar disorder, rheumatoid arthritis, carpal tunnel in both hands, cubital tunnel in the left hand, 20 percent loss in the left arm, respiratory failure, and bleeding tendency with a rare factor five (Exhibit B1E/2). At the time she applied for benefits, the [Plaintiff] was 5'3" tall and weighed 280 pounds (Exhibit B1E/2). The employee assisting with the application process noted the [Plaintiff] was cooperative and informative (Exhibit B2E/2). In her function report, the [Plaintiff] stated that she "cannot deal with people" (Exhibit B3E/1). She reported she cannot deal with crowds at all (Exhibit B3E/1). She stated sitting or standing for a period of time hurts, and she dropped things all the time (Exhibit B3E/1). She noted that she falls when going up and down steps at home and has to crawl upstairs at night (Exhibit B3E/1). She stated that she cannot breathe when walking short distances because it feels like someone is sitting on her chest (Exhibit B3E/1). She reported that she is up every hour trying to relieve pain and has insomnia, which limit sleep (Exhibit B3E/2). She suggested that she could not leave the home because of her nerves, and she reported that she was too paranoid to drive (Exhibit B3E/4). The [Plaintiff] indicated difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, remembering, concentrating, using her hands, and getting along with others (Exhibit B3E/6). She

2

suggested that she was only able to lift five pounds and walk six steps (Exhibit B3E/6). She also noted some difficulty following instructions because she got sidetracked (Exhibit B3E/6). She reported that she avoided authority at all costs (Exhibit B3E/7).

At the hearing, the [Plaintiff] testified she was unable to work because of an inability to lift things with her left arm and breathing difficulties. She stated that she drops everything with her left hand, and breathing difficulties limit walking. She suggested that she was once told that she only had 20% usage in the left arm. She reported that she had to wear a splint on her hand all the time except for when she is in the shower, and she suggested the only way she can sleep was with her hand against the headboard. She stated that she cannot do typing or writing with her left hand. She testified that her fingers would not uncurl. She reported that her hands and legs hurt all the time. Cortisone injections were recommended, but the [Plaintiff] was not interested because she was scared. She reported that she tries to go on walks, but she cannot breathe. She indicated that she walked to the other end of her apartment complex and had to sit down because of her breathing. She reported that the cavity in her lungs was being treated as an infection, but they were monitoring it. The [Plaintiff] also noted that it hurts to try to go out and walk because of degenerative changes in the knee and rheumatoid arthritis and osteoarthritis in the joints. The [Plaintiff] alleged that she was never told she could go back to work and that her arm and lung doctors would not release her. She reported that she has attempted to return to work since 2011, but every job she applies for tells her she is a liability. The [Plaintiff] emphasized at the hearing that she was unable to use her left arm for anything such as lifting, dishes, or cooking. The [Plaintiff] also testified to migraine complaints, but she noted that her medications usually help. However, she also suggested that she was not allowed medications for her migraines due to a blood disorder. She suggested that she has issues with remembering or concentrating, and she noted difficulties with crowds of three or more people. She stated that she was only able to sleep two to three hours per night. The [Plaintiff] further testified that she was limited to walking twenty minutes, standing five to ten minutes, lifting five to ten pounds with her left arm, and lifting twenty pounds with her right arm.

(Tr. 24–25).

Despite her subjective complaints, the [Plaintiff] told a Social Security employee that she did not feel her bipolar disorder was a big issue in a December 2017 report of contact (Exhibit B3A/5). She stated that she could "work fine with her bipolar issue, as she has been dealing with it for awhile" (Exhibit B3A/5).

(Tr. 29).

## B. Relevant Medical Evidence

ALJ Ellis summarized the relevant medical records concerning Plaintiff's physical symptoms.

> The [Plaintiff] has a history of pain related to osteoarthritis, rheumatoid arthritis, degenerative joint disease of the left knee, bilateral carpal tunnel syndrome, and left cubital tunnel syndrome, but the record does not support symptoms or limitations as intense, persistent, or limiting as alleged. The [Plaintiff] reported that she was in the emergency room for knee pain in December 2016 and was diagnosed with effusion of the left knee joint (Exhibit B3F/23). She continued to complain of knee pain at a February 2017 primary care visit (Exhibit B3F/23). A June 2017 x-ray of the left knee showed only mild narrowing of the lateral femoral patellar joints pace with a moderate joint effusion (Exhibit B3F/61). July 2017 labs showed an elevated rheumatoid factor and elevated sedimentation rate with complaints of arthralgias for over a year (Exhibit B6F/1). She suggested that he initially had hip pain with severe knee pain for the past six months (Exhibit B6F/1). She also indicated some lumbar pain (Exhibit B8F/2). She described her pain as dull, aching, and sharp with symptoms of joint pain and swelling that is made worse by overuse and weather (Exhibit B6F/2). She indicated that her morning stiffness only lasted for ten minutes (Exhibit B6F/2). On examination, the [Plaintiff] had some tenderness at the left MCPs 3-5, lumbar spine, and left knee with the left knee also having a positive McMurray's sign (Exhibit B6F/4). However, she had a normal sensory and motor examination with bilateral upper and lower extremity strength rated a normal 5/5 (Exhibit B6F/3). Her September 2017 x-ray of the left knee showed only mild to moderate degenerative joint disease (Exhibit B3F/62). Her MRI showed changes suggestive of degenerative joint disease (Exhibit B6F/11). The x-ray of her lumbar spine showed moderate lower lumbar facet arthropathy and mild degenerative disc disease (Exhibit B6F/10). X-rays of the bilateral hands showed no evidence of inflammatory arthropathy while x-rays of the bilateral hips showed only mild degenerative joint disease (Exhibit B6F/10). In addition to her positive rheumatoid factor, she also had positive CCP antibodies (e.g. Exhibit B10F/16). Her September 2017 rheumatology follow-up indicates that the [Plaintiff] was started on a prednisone taper but stopped because of diarrhea (Exhibit B6F/8).
>
> She was started on a Medrol Dosepak by her primary care provider, which she indicated helped (Exhibit B6F/8). However, her morning stiffness purportedly increased from ten minutes to sixty minutes (Exhibit B6F/8). On examination, she only had left wrist and third MCP synovitis, and her examination was otherwise normal (Exhibit B6F/9). She continued to have a normal sensory and motor examination with full 5/5 strength in the bilateral upper and lower extremities (Exhibit B6F/9). Her normal sensory and motor examinations, including her normal strength, do not support symptoms as severe as alleged.

In November 2017, the [Plaintiff] reported that her pain was rated 7/10, but she had no morning stiffness (Exhibit B6F/14). She complained of pain in the elbow, knee, lumbar spine, and thoracic spine (Exhibit 6F/14). On examination, she only had tenderness in the bilateral wrists, MCPs, and knee with knee crepitus, but her sensory and motor examinations remained normal with full 5/5 strength in the bilateral upper and lower extremities (Exhibit B6F/15). Her treatment notes reflect that she was offered injections for her osteoarthritis, but she refused (Exhibit B6F/17). She was also hesitant to take anything for pain due to a history of idiopathic thrombocytopenia (Exhibit B6F/17). At her February 2018 rheumatology appointment, the [Plaintiff] complained of pain in the wrist, hand, hip, knee, ankle, foot, cervical spine, and lumbar spine, but it was only rated 5/10 and described as intermittent (Exhibit B6F/20). She noted that she did not have any morning stiffness (Exhibit B6F/20). On examination, she only had tenderness in the bilateral wrists with knee crepitus (Exhibit B6F/21). She continued to have normal motor and sensory examinations with normal 5/5 strength in the bilateral upper and lower extremities (Exhibit B6F/21). In May 2018, the [Plaintiff] reported that her pain was located in the elbow, wrist, hand, hip, knee, cervical spine, and lumbar spine, and she stated it was worsening in the back and knees, though she still rated it 5/10 (Exhibit B10F/13). She stated that she had thirty minutes of morning stiffness (Exhibit B10F/13). On examination, she only had tenderness in the lumbar spine and bilateral knees (Exhibit B10F/14). She had no synovitis and normal sensory and motor examinations with normal 5/5 strength in the bilateral upper and lower extremities (Exhibit B10F/14). She was told that her rheumatoid arthritis was better controlled, and her symptoms were likely due to osteoarthritis and obesity (Exhibit B10F/17). In August 2018, the [Plaintiff] suggested her morning stiffness lasted approximately three to four hours (Exhibit B10F/23). On examination, she only had left wrist and elbow tenderness with right knee tenderness and crepitus (Exhibit B10F/24). Her sensory and motor examination continued to be normal with normal 5/5 strength in the bilateral upper and lower extremities (Exhibit B10F/24). Thus, her good strength continues to demonstrate that her symptoms are not as intense, persistent, or limiting as alleged.

At her November 2018 appointment, the [Plaintiff] reported pain in the elbow, wrist, hand, lumbar spine and fingers that was worse in the left elbow and lower back (Exhibit B10F/41). She rated her pain as 7/10 and indicated that she continued to have moderate morning stiffness that lasted about three hours (Exhibit B10F/41). On examination, the [Plaintiff] had left elbow and forearm tenderness with no synovitis (Exhibit B10F/42). Her rheumatologist repeated that she had no active synovitis (Exhibit B10F/42). Her sensory and motor examination continued to be normal with 5/5 strength (Exhibit B10F/42). Her treatment notes indicate that her left elbow and lower back pain were associated with cubital tunnel syndrome and lumbar spondylosis, respectfully, and her rheumatoid arthritis was well controlled (Exhibit B10F/43). December 2018 primary care notes show diagnoses of bilateral carpal tunnel syndrome and left cubital tunnel syndrome with recommendations for a future EMG and nerve conduction study (Exhibit B11F/24). She received

5

injections for her carpal and cubital tunnel syndromes at that visit (Exhibit B11F/24).

February 2019 rheumatology notes reflect continued complaints of pain in the shoulder, wrist, hip, knee, cervical spine, and lumbar spine that was rated 7/10 (Exhibit B15F/4). However, she only had forty minutes of morning stiffness (Exhibit B15F/4). On examination, she had tenderness in the left elbow, forearm, and shoulder but with no synovitis (Exhibit B15F/5). Her sensory and motor examinations were still normal with full 5/5 strength in the bilateral upper and lower extremities (Exhibit B15F/5). In May 2019, the [Plaintiff]'s pain was reduced to 5/10, and she described her symptoms as moderate (Exhibit B15F/9). Morning stiffness only lasted thirty minutes (Exhibit B15F/10). On examination, she only had tenderness in the left wrist, MCPs and PCPs (Exhibit B15F/11). Nevertheless, she continued to present with normal sensory and motor examinations, including normal 5/5 strength in the bilateral upper and lower extremities (Exhibit 26 B15F/11). In July 2019, the [Plaintiff] complained of pain in all joints that was worse in the left arm and right ankle (Exhibit B15F/16). She reported her pain was rated 7/10, but she still only considered her symptoms moderate with only thirty minutes of morning stiffness (Exhibit B15F/16). On examination, she had tenderness in the left MCPs, PIPs, wrist, and elbow (Exhibit B16F/17). However, despite her pain complaints, she continued to present with normal sensory and motor examinations, including normal 5/5 strength (Exhibit B15F/17) . . . .

The [Plaintiff] also has a longstanding history of respiratory impairments, but the record does not support symptoms as severe as alleged. The record reflects that the [Plaintiff] had a left upper lobe nodule wedge excision in 2011 (Exhibit B16F/4). Pathology showed necrotizing/suppurative granuloma with associated chronic inflammation and fibrosis but no fungi, mycobacteria, polarizable crystalline material, or evidence of neoplasm was identified (Exhibit B16F/5). However, the records available for review reflects limited respiratory complaints, especially during the period of adjudication (Exhibits B1F-B16F). Her records indicate that a September 2014 pulmonary function test revealed a normal spirometry, though the test itself is not in the record (Exhibit B16F/12). November 2016 treatment notes show complaints of a cough and shortness of breath, along with other symptoms indicative of an upper respiratory infection (Exhibit B3F/15). Her physician noted that the [Plaintiff] had a past medical history of asthma, COPD, and pneumonia (Exhibit B3F/15). Her chest x-ray showed right lower lobe infiltrates and emphysematous changes compatible with COPD (Exhibit B3F/58). She was diagnosed with bronchopneumonia and panlobular emphysema (Exhibit B3F/16). She was advised to quit smoking (Exhibit B3F/21). In February 2017, an examination showed the [Plaintiff]'s lungs were clear to auscultation and symmetric with no lifts or hooves (Exhibit B3F/24). She had good expansion, and respirations were easy (Exhibit B3F/24). In September 2017, the [Plaintiff] complained of another upper respiratory infection with coughing and shortness of breath (Exhibit B3F/37). However, on examination, her lungs were clear to auscultation and symmetric with no lifts or hooves (Exhibit B3F/39). She had good

lung expansion, and respirations were easy (Exhibit B3F/39). In July 2018, the [Plaintiff] visited her primary care provider for a COPD follow-up without exacerbation (Exhibit B11F/18). She had no current symptoms, and she was not on oxygen (Exhibit B11F/18). She had no exacerbations of COPD in the past year, and she did not have any hospitalizations related to COPD in the past year (Exhibit B11F/18). Her COPD did not result in any limitations in performing activities of daily living (Exhibit B11F/18). Her ability to walk before needing to rest due to shortness of breath depended on the weather (Exhibit B11F/18). She was not using albuterol daily, and she was not following with a pulmonologist (Exhibit B11F/18). She was still using tobacco (Exhibit B11F/18). On examination, the [Plaintiff] had diminished pulmonary function throughout (Exhibit B11F/20). An August 2018 chest x-ray showed no radiographic evidence of an acute cardiopulmonary process (Exhibit B11F/43). [ ]

The [Plaintiff] reported to the emergency room with complaints of chest pain in May 2019 (Exhibit B14F). A CT of the heart partially visualized what may represent airspace disease along the visualized lateral aspect of the lungs with no noncalcified nodules in the lungs but recommended further evaluation (Exhibit B14F/19). Her subsequent chest x-ray incidentally showed a nodule in the peripheral of the left lower lung (Exhibit B14F/21, 23). Despite being worked up for chest pains at the time, she had no shortness of breath or other respiratory symptoms when the nodule was found (Exhibit B14F/23). On examination, lung function was diminished, but she had good respiratory effort, adequate airflow, and no rales or wheezing (Exhibit B14F/28). At a June 2019 primary care visit, the [Plaintiff]'s physician continued to encourage her to stop smoking (Exhibit B13F/11). In August 2019, the [Plaintiff] participated in her initial smoking cessation counseling visit (Exhibit B16F/3). She also had an initial evaluation with a pulmonary consultation to discuss a cavitary lesion of the lung (Exhibit B16F/4). The chest CT that revealed the thick-walled cavitary lesion in the left lower lobe, which measured 19mm in diameter, had differential diagnoses of both infectious and neoplastic etiologies (Exhibit B16F/10). Her pulmonologist noted that the [Plaintiff] was not treated with antibiotics when the lesion was discovered (Exhibit B16F/4). On examination, her lung function was diminished, but there was no frank wheezing or rhonchi (Exhibit B16F/9). She was started on Levaquin for fourteen days with instructions to repeat her chest CT scan to see if there was improvement in her cavitary nodule (Exhibit B16F/13). Despite significant complaints related to her respiratory impairments, the [Plaintiff] testified that she continues to smoke and has only recently began following with pulmonology. She acknowledged that she was able to walk about twenty minutes before having to take a break due to breathing difficulties. Her records reflect minimal respiratory complaints with limited, conservative treatment during the period under review, and the examinations and physician's notes are not consistent with symptoms as severe as alleged (Exhibits B1F-B16F). [ ]

Throughout the period of adjudication, the [Plaintiff] presents with a body mass index consistent with obesity (Exhibits B1F-B16F). Though the [Plaintiff] did not

testify to specific symptoms or limitations related to her obesity, the undersigned recognizes that it can contribute to and exacerbate some of the symptoms previously discussed, particularly with respect to pain. In fact, her treating providers, including her rheumatologist, consistently recommended weight loss to help alleviate symptoms and limitations (Exhibits B1F-B16F). [ ]

(Tr. 25–28).

ALJ Ellis also summarized the records related to Plaintiff's mental impairments.

The [Plaintiff] also has a history of mental impairments, but the record does not support symptoms as intense, persistent, or limiting as alleged. Psychiatry notes dating to September 2016 reflect a history of bipolar I disorder (Exhibit B4F). However, PHQ-2 assessments from primary care visits reflect a score of 0, indicating no depression (e.g. Exhibit B3F). Treatment notes dating to December 2016 show that she had a relatively normal mental status with casual grooming, cooperative behavior, and good eye contact (Exhibit B4F/10). She had no psychomotor agitation or slowing and no abnormal movements (Exhibit B4F/10). Speech was normal, and her mood was "good" (Exhibit B4F/10). She denied any suicidal or homicidal thoughts, delusions, or other abnormalities of thought content (Exhibit B4F/10). She denied any hallucinations or other abnormalities in perception (Exhibit B4F/10). Attention and concentration were intact, recent and remote memory were intact, fund of knowledge and intelligence were average, and insight and judgment were fair (Exhibit B4F/10). Her psychiatry notes into December 2017 show that she was doing "fairly well" with a stable mood, though some trouble sleeping was noted (Exhibit B4F/1). Her mental status examination was unchanged from the relatively normal examination in December 2016 (Exhibit B4F). [ ].

[In December 2017], the [Plaintiff] participated in a psychological consultative examination (Exhibit B5F). She noted that she did not have a history of engaging in behavior health crisis inpatient admission treatment episodes (Exhibit B5F/2). The [Plaintiff] reported that she actively avoids interpersonal interactions and has difficulty managing herself when she has to engage interpersonally (Exhibit B5F/5). She reported she struggles managing herself and sometimes throws things when she is frustrated (Exhibit B5F/5). While she has volatile expressions of intense emotions, such as anger, she denied thoughts of wanting to hurt others (Exhibit B5F/5). She stated that her typical mood has been intact, but she has crying episodes daily with no suicidal thoughts (Exhibit B5F/5). She endorsed hopelessness, excessive guilt, and excessive worry, but self-esteem was mostly intact (Exhibit B5F/6). She indicated that she had low energy, decreased appetite, intermittent insomnia, recent episodes of poor memory function, recent episodes of difficulty with concentrating, racing thoughts, and easy distraction (Exhibit B5F/6). She reported experiences with excessively irritated moods, excessive energy, excessive sleeplessness, and excessive grandiose ideas but no excessively pressured speech or engagement in high-risk behaviors (Exhibit B5F/6). She suggested that

she had hallucinations from the "spiritual world" and delusional processes where she felt others were out to get her despite never reporting such hallucinations or delusions to her treating psychiatrist (Exhibits B3F and B5F/6). She stated that she did not like going anywhere because she felt stressed and did not like dealing with others (Exhibit B5F/7). On examination, the [Plaintiff]'s clothing was appropriate, grooming was intact, and eye contact was good (Exhibit B5F/5). Speech embellishment was over elaborative and spontaneity of speech was impulsive (Exhibit B5F/5). The [Plaintiff]'s mood was anxious, and she appeared tense (Exhibit B5F/5). She did not evidence psychomotor agitation or retardation (Exhibit B5F/5). She evidenced some distraction by attending to ambient noises in the office, poor motor control by interrupting the examiner before questions were completed, and difficulties recalling information from long-term memory stores (Exhibit B5F/6). The [Plaintiff] recalled two out of three words after a five-minute delay, and she was able to repeat six digits forward and three backward (Exhibit B5F/7). She responded "I don't know" to the vast majority of general fund of knowledge questions, including questions related to who is currently the president (Exhibit B5F/7). However, she was able to appropriately analyze five of the six word pairs presented to her (Exhibit B5F/7). She accurately solved all four arithmetic problems that were presented to her (Exhibit B5F/7). She completed a serial 3s task in 42 seconds with three errors (Exhibit B5F/7). The more complex mathematic task was repeated to her three times and slowed down significantly the third time, but she was eventually able to solve that equation (Exhibit B5F/7). Her intellectual ability appeared to be in the low average range (Exhibit B5F/8). The [Plaintiff] was diagnosed with bipolar I disorder with psychotic features (Exhibit B5F/8). However, despite her performance on her consultative examination, a March 2018 psychiatry note demonstrates that she told her treating psychiatrist that she was doing well since her last visit with a stable mood, though she was worried about her son and his desire to stop taking medications (Exhibit B7F/10). She denied suicidal ideation, homicidal ideation, and hallucinations (Exhibit B7F/10). She continued to have a relatively normal mental status with casual grooming, cooperative behavior, and good eye contact (Exhibit B7F/10). She had no psychomotor agitation or slowing and no abnormal movements (Exhibit B7F/10). Speech was normal, and she denied any suicidal or homicidal thoughts, delusions, or other abnormalities of thought content (Exhibit B7F/10). She denied any hallucinations or other abnormalities in perception (Exhibit B7F/11). Attention and concentration were intact, recent and remote memory were intact, fund of knowledge and intelligence were average, and insight and judgment were fair (Exhibit B7F/11). Thus, her treatment notes do not support symptoms as intense, persistent, or limiting as alleged, even despite her performance on her consultative examination.

June 2018 treatment notes show that the [Plaintiff] was doing fairly well, and her mood was good (Exhibit B11F/32). Her mental functioning continued to be relatively normal (Exhibit B11F/32-33). Psychiatry notes from two months before her hearing, in June 2019, are the first to reflect that the [Plaintiff] was not doing well (Exhibit B12F/3). She reported that she was stressed due to finding another

spot on her lung (Exhibit B12F/3). While she was excessively worried, she denied mood swings, aggression, manic symptoms, psychotic symptoms, suicidal ideation, and homicidal ideation (Exhibit B12F/3-4). Her mental status continued to be relatively normal, including a "fine" mood (Exhibit B12F/3). She had casual grooming, a cooperative attitude, and good eye contact (Exhibit B12F/3). She had no psychomotor agitation, and she had normal speech (Exhibit B12F/3). She denied abnormalities in perception and thought processes were appropriate (Exhibit B12F/4). Her memory was focused, her fund of knowledge and intelligence were average, and insight and judgment were good (Exhibit B12F/4). In addition to her consistently good functioning on her mental status examinations, primary care notes also indicate frequent PHQ-2 assessments with scores of 0, indicating no depression (e.g. Exhibits B3F, B11F, and B13F). Though the [Plaintiff] testified to difficulty with crowds of three or more people, she acknowledged that she was able to go to her sons' football games. Additionally, the [Plaintiff] presents with a relatively normal mental functioning in almost every record (Exhibits B1F-B16F). [ ].

(Tr. 28–30).

### C. ALJ Ellis' Decision

ALJ Ellis indicated that because there had been a final determination of Plaintiff's prior disability applications, she was bound by the previous findings for the unadjudicated period that began after that prior decision was issued in the absence of new and material evidence or changed circumstances. (Tr. 15). ALJ Ellis determined that there was, however, new and material evidence documenting a significant change in circumstances, and thus that she was not bound by the previous findings. (*Id.*)

ALJ Ellis next found that Plaintiff has not engaged in substantial gainful activity since October 4, 2017. (Tr. 17). ALJ Ellis also determined that Plaintiff suffered from the following severe impairments: osteoarthrosis, rheumatoid arthritis, dysfunction of the left knee, bilateral carpal tunnel syndrome, left cubital tunnel syndrome, chronic obstructive pulmonary disease (COPD), obesity, and depression. (*Id.*). ALJ Ellis, however, further determined that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed

10

impairment. (Tr. 20).

As to Plaintiff's residual functional capacity ("RFC"), ALJ Ellis concluded:

After careful consideration of the entire record, the undersigned finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she is limited to standing and/or walking for four hours per eight-hour workday with frequent use of foot controls. The [Plaintiff] is limited to occasional climbing of ramps and stairs with no climbing of ladders, ropes, or scaffolds. The [Plaintiff] is able to frequently balance with occasional stooping, kneeling, crouching, and crawling. She is limited to frequent handling and fingering bilaterally. She should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, and fumes, odors, dusts, gases, and poor ventilation. The [Plaintiff] should avoid all exposure to unprotected heights and moving mechanical parts, and she should have no work involving commercial driving. She is able to understand, remember, and carry out instructions for routine work with no quick pace or high production quotas. She should have no tandem work and no more than superficial contact with others with no direct supervision. She would need advance notice of any additional duties or responsibilities that might be assigned. She would be off task up to 15% of the day.

(Tr. 23).

ALJ Ellis considered medical opinion evidence and prior administrative findings. ALJ Ellis determined that the findings from state agency reviewing physicians, Drs. Stephen Sutherland and Diane Manos, were "persuasive," and that they were "consistent with and supported by the record even when giving the Plaintiff the full benefit of the doubt." (Tr. 31). ALJ Ellis determined that the findings from state agency reviewing psychologists, Drs. Paul Tangeman and Kathleen Malloy, were "mostly persuasive" and that they were "generally consistent with and supported by the record." (*Id.*). ALJ Ellis determined that the opinion from Dr. Gregory Johnson, the psychological consultative examiner, was "somewhat persuasive," finding that although it was supported by Plaintiff's performance on her consultative examination, treatment notes reflected that Plaintiff had relatively normal functioning with few complaints. (Tr. 32).

Relying on the Vocational Expert's ("VE's") testimony, ALJ Ellis concluded that Plaintiff could not perform her past relevant work as a home attendant but that she could perform jobs that

11

exist in significant numbers in the national economy such as a housekeeping/cleaner, cafeteria attendant, and an office helper. (Tr. 33–34). ALJ Ellis therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since October 4, 2017 . . . " (Tr. 34).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff asserts that ALJ Ellis's RFC determination and her question to the VE were overly ambiguous. (Doc. 11, at 6–9). Plaintiff also asserts that ALJ Ellis' RFC determination was not substantially supported by the record. (*Id.* at 9–11). The Undersigned finds that both assertions of error lack merit.

### A. Alleged Ambiguities in the RFC and Hypothetical Question to the VE

Plaintiff alleges that ALJ Ellis' RFC determination was ambiguous in two ways. First, Plaintiff contends that the RFC and the hypothetical question posed to the VE were ambiguous

because they included the limitation that Plaintiff (or a hypothetical person) would "need advance notice of any additional duties or responsibilities that might be assigned." (Doc. 11, at 6). Plaintiff alleges that this was ambiguous because ALJ Ellis did not indicate how much notice was required and did not specify what constituted an additional duty. (*Id.*). Plaintiff contends that this unclear language affected the hypothetical question that ALJ Ellis posed to the VE.

In support of that contention, Plaintiff relies on a report and recommendation that was overruled in *Russell v. Comm'r of Soc. Sec.*, No. 2:15–cv–88, 2016 WL 286431, (S.D. Ohio Jan 25, 2016). In that case, the Magistrate Judge recommended remand where an RFC and hypothetical question to a VE stated that the plaintiff was "hesitant to ask questions or ask for help." *Id*. at *2. The Magistrate Judge found that the language "hesitant to ask questions" was fatally ambiguous even though the VE testified that "as far as hesitant to ask questions . . . if it's not happening all the time and she's not proceeding with incorrect, you know, then I think she could do the cleaning job." *Id*. at *4. The Magistrate Judge concluded that the language "hesitant to ask" described a characteristic rather than a quantifiable limitation—it could mean someone who always hesitated initially, but eventually asked for guidance about work or it could mean someone who never asked for guidance until too late to make corrections. *Id*. at *4. The Magistrate Judge further concluded that any answer to a hypothetical question that was not based on a quantifiable limitation could not serve as substantial evidence to support an ALJ's determination because it failed to accurately portray a claimant's limits. *Id*. at *4. The District Judge, however, determined that the plaintiff had waived objections to the ambiguity of the ALJ's question to the VE by failing to object to its purported ambiguity at the hearing or by cross-examining the VE about the meaning of being "hesitant to ask questions." *Russell v. Colvin*, No. 2:15–cv–88, 2016 WL 11736165, at *2–3 (S.D. Ohio March 2, 2016). Plaintiff's failure to raise the ambiguity issue at the hearing deprived the

13

ALJ of an opportunity to further address and explore it. *Id*. at *3. The District Judge's decision was upheld by the Sixth Circuit Court of Appeals. *Russell v. Comm'r of Soc. Sec.*, No. 16–3442, 670 Fed. App'x. 388 (6th Cir. Nov. 17, 2016).

Such is the case here. The Undersigned is not convinced that "advance notice" of "additional duties" is ambiguous—it implies that notice would be required before extra assignments were to be performed. But even if those phrases were susceptible to multiple meanings, Plaintiff has forfeited her ambiguity argument. The hypothetical question that ALJ Ellis posed to the VE included the "advance notice" of "additional duties" limitation. (Tr. 70–71). Plaintiff, who was represented by counsel, had the opportunity to further ask the VE about that hypothetical question and to ask for clarification about the VE's understanding of those particular phrases. Plaintiff did not do so. Instead, Plaintiff, through counsel, asked the VE questions about a hypothetical person who had more fingering, handling, lifting, standing, walking, and absenteeism limitations. (Tr. 71–73). Accordingly, Plaintiff cannot make this ambiguity argument now. *See Kepke v. Comm'r of Soc. Sec.,* 636 fed. App'x. 625, 636 (6th Cir. 2016) (because the plaintiff failed to probe alleged deficiency in a hypothetical at the ALJ hearing, the argument was forfeited); *Sims v. Comm'r of Soc. Sec.,* 406 Fed. Appx. 977, 982 (6th Cir. 2011) ("Yes, the vocational expert's testimony could have been further refined; but as the district court pointed out, plaintiff's counsel had the opportunity to cross-examine, but asked only one question and did not probe the deficiency now identified on appeal."); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) (rejecting claim of error where plaintiff had full opportunity to examine the vocational expert).

Second, Plaintiff contends that the RFC and the hypothetical question posed to the VE were ambiguous because they included a limitation that Plaintiff (or a hypothetical person) "would be

14

off task up to 15% of the day." (Doc. 11, at 8–9). Plaintiff asserts that it is unclear if ALJ Ellis meant up to and including 15% or merely up to 15%. (*Id*.).

The Undersigned does not find that that ALJ Ellis' off-task question to the VE was ambiguous. After the VE identified several representative jobs ALJ Ellis asked the VE: "What would the maximum off-task time that, in those type jobs, that would be tolerated, please?" (Tr. 71). The VE testified in response: "About 15% of the time. In other words, people have to be able to concentrate on their jobs at least 85% of the time." (*Id*.). It is clear from this exchange that the VE testified that the representative jobs required people to be on task at least 85% of the time, and thus, that people could be off task up to and including 15% of the time. In any event, Plaintiff also waived this argument by failing to object or cross-examine the VE about any purported ambiguity in this off-task question. *See Kepke,* 636 Fed. App'x. at 636; *Sims v. Comm'r of Soc. Sec.,* 406 Fed. Appx. at 982; *Lindsley*, 560 F.3d at 606.

For these reasons, the Undersigned finds that Plaintiff's alleged ambiguity errors lack merit. The questions posed to the VE were sufficiently clear and to the extent they were unclear, Plaintiff waived this argument by failing to ask clarifying questions.

**B.**     **Substantial Support for the RFC Determination**

In addition, Plaintiff asserts that ALJ Ellis' determination that she could perform a reduced range of light work was not substantially supported by the record. She specifically asserts that the record does not support the determination that she could perform four hours of standing/walking per workday. (Doc. 11, at 9). But the state agency reviewers, Drs. Sutherland and Manos, both found that Plaintiff was capable of standing/walking four hours in an eight-hour workday. (Tr. 117, 136). In addition, the record reflects that Plaintiff consistently had full strength in her bilateral lower extremities. (Tr. 414, 420, 426, 432, 517, 527, 545, 691, 697). Plaintiff testified that she

could walk up to 20 minutes at a time. (Tr. 65). Records from 2017 and 2018 noted that Plaintiff's gait was steady. (Tr. 390, 392, 471, 474). On July 17, 2018, Plaintiff reported that the distance that she was able to walk before shortness of breath forced her rest depended on the weather. (Tr. 566). ALJ Ellis' determination that Plaintiff could walk/stand four hours in an eight-hour workday is thus substantially supported by the record.

Plaintiff also contends that the record does not support the determination that she could perform light work because the record does not demonstrate that she could perform the lifting and carrying requirements for light work. But Drs. Sutherland and Manos both found that Plaintiff was capable of lifting/carrying 20 pounds occasionally and 10 pounds frequently. (Tr. 117, 135–36). These amounts are consistent with light work. 20 C.F.R. §404.1567(b). The record also reflects that Plaintiff consistently had full strength in her bilateral upper extremities. (Tr. 414, 420, 426, 432, 517, 527, 545, 691, 697). Examinations also regularly found that Plaintiff had no edema, cyanosis or clubbing in her extremities. (Tr. 304, 354, 668, 709). An exam on May 8, 2019, revealed that she had a normal range of motion. (Tr. 649). Moreover, Plaintiff testified that she could lift approximately 20 pounds with her right arm and approximately 5 to 10 pounds with her left arm. (Tr. 65). Accordingly, this contention is without merit.

Plaintiff points to record evidence documenting her symptoms and diagnoses and implies that they support a more restricted RFC finding. (Doc. 11, at 10). But even if that evidence could support a more restrictive RFC, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotations omitted).

Plaintiff finally asserts that ALJ Ellis' determination that she could perform a range of light work was not supported by substantial evidence because Drs. Sutherland, Manos and ALJ Gates found that she was only capable of sedentary work. (Doc. 11, at 10–11). That assertion mischaracterizes the findings. Drs. Sutherland and Manos clearly indicated that that they were aware of and reviewed ALJ Gates' prior determination. (Tr. 119, 137). However, each found that there was new and material evidence of a change in circumstances, so they declined to adopt ALJ Gates' prior determination in their findings. (*Id*.).

Plaintiff is, however, correct that ALJ Gates previously determined that she was limited to sedentary work. ALJ Ellis indicated that she was bound by that prior determination in the absence of new and material evidence or changed circumstances provide a basis for a different RFC finding. (Tr. 15). Plaintiff does not challenge this conclusion. In *Earley v. Comm'r of Soc. Sec.*, however, the Sixth Circuit explained that *res judicata* does not apply when a claimant files a subsequent application for benefits for a different period. 893 F.3d 929, 933 (6th Cir. June 27, 2018). Instead, an ALJ "may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id*. Here, Plaintiff's current application seeks benefits for a new period— one that began on October 4, 2017. Therefore, ALJ Ellis was not bound by ALJ Gates' June 2, 2016, determination. Nevertheless, ALJ Ellis was permitted to consider it.

And clearly she did. Nevertheless, and despite having considered ALJ Gates' prior determination, ALJ Ellis determined that a less restrictive RFC was appropriate. (Tr. 15). Substantial evidence supports that determination. Record evidence demonstrated that Plaintiff consistently had full strength in her bilateral lower extremities (Tr. 414, 420, 426, 432, 517, 527, 545, 691, 697); she could walk up to 20 minutes at a time (Tr. 65); and that the distance that Plaintiff could walk was before shortness of breath forced her to rest depended on the weather (Tr. 566).

17

Other evidence demonstrated that that Plaintiff consistently had full strength in her bilateral upper extremities (Tr. 414, 420, 426, 432, 517, 527, 545, 697) and that she could lift approximately 20 pounds with her right arm and approximately 5 to 10 pounds with her left arm (Tr. 65). Moreover, diagnostic imaging studies revealed only moderate findings—an X-ray of Plaintiff's left knee on September 18, 2017, showed only mild to moderate degenerative joint disease. (Tr. 372). An X-ray of Plaintiff's hips done that same day showed only mild degenerative joint disease. (Tr. 421).

Accordingly, Plaintiff's assertion that ALJ Ellis' RFC determination lacks substantial record support is meritless.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court

adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

    IT IS SO ORDERED.


Date:   July 1, 2021                                  /s/ Kimberly A. Jolson
                                                         KIMBERLY A. JOLSON
                                                         UNITED STATES MAGISTRATE JUDGE